# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

INFORMATION ASSOCIATED WITH THE
CELLULAR TELEPHONE ASSIGNED CALL
NUMBER 321-960-1899, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON WIRELESS

)
)
)
)
)
)

Case No. 20-903M(NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

18 U.S.C. §§ 371 (Conspiracy), 373 (Solicitation to Commit a Crime of Violence), 842(p) (Distribution of Information Relating to Explosives, Destructive Devices, and Weapons of Mass Destruction), 1366 (Destruction of an Energy Facility) and 2339A (Providing Material Support to Terrorists)

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _30_ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tiffany Burns, FBI Special Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _March 12, 2020_

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tiffany Burns, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 321-960-1899, ("the Target Cell Phone"), that is stored at premises controlled by VERIZON WIRELESS, a wireless telephone service provider headquartered at 180 Washington Valley Road, in Bedminister, NJ 07921. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone .

3. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since May 2019. I am currently assigned to the Milwaukee Division, where I investigate violations of federal law. I have investigated and assisted in the investigation of matters involving violations of federal law related to domestic terrorism, including the service of search and arrest warrants.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 371 (Conspiracy), 373 (Solicitation to Commit a Crime of Violence), 1366 (Destruction of an Energy Facility) and 2339A (Providing Material Support to Terrorists) have been committed, are being committed, and will be committed by JACKSON SAWALL (SAWALL), user of the Target Cell Phone, as well as CHRISTOPHER BRENNER COOK (COOK) and JONATHAN ALLEN FROST a/k/a KAXUL (FROST a/k/a KAXUL). There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

6.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

2

## PROBABLE CAUSE

7.     The FBI has confirmed from multiple sources that SAWALL's phone number is **321-960-1899** (the Target Cell Phone). On January 25, 2020, COOK's mother told FBI agents that SAWALL's phone number is **321-960-1899**. During a traffic stop by the Wisconsin State Patrol on February 23, 2020, SAWALL provided his phone number as **321-960-1899**. The Holiday Inn Express Columbus – Dublin has also informed the FBI that along with SAWALL's hotel reservations from February 21, 2020, to February 23, 2020, SAWALL provided the hotel with his phone number as **321-960-1899**. The FBI verbally confirmed with Verizon Wireless that Verizon Wireless is the cellular provider for the Target Cell Phone.

8.     On October 23, 2019, E.G., a Canadian citizen, applied for admission to the United States at the Detroit Ambassador Bridge in Ontario via plated vehicle (CFNV114) and was referred to U.S. Customs and Border Protection (CBP) Detroit for secondary examination.

9.     E.G. was interviewed by officers of the CBP Tactical Terrorism Response Team (TTRT). E.G. stated he was traveling to the United States to visit his friends: Natalia in Tennessee and Chris in Ohio.

10.     E.G. had properly filled out ATF-6 forms and according to statements he made in the interview, E.G. intended to take his shotgun, AR-15, and pistol to Tennessee for target practice with Natalia. E.G. planned on spending five days in the United States. On his way back to Canada, E.G. wanted to stop in Ohio to visit his friend Chris. E.G. met Natalia and Chris through the Discord app[1] for mobile devices. Based on a subsequent interview, E.G. and Chris

---

[1] Discord is a free voice, video and text chat app for teens and adults ages 13 and up. Discord gained popularity with the alt-right due to the client's supporting anonymity and privacy. Several neo-Nazi and alt-right servers have been shut down by Discord, including those operated by neo-

had known each other for two months. During the inspection of E.G.'s phone, multiple images of Nazi, white power, and anti LGBTQ propaganda were found. E.G. stated he had not met Chris in person, but believed Chris was approximately 17 years old.

11.    E.G. possessed three weapons (AR-15, pistol, and a high-volume shotgun) and approximately 100 rounds of ammunition, including ammunition for weapons he did not have possession of during the crossing (it appeared he had documentation to import the weapons.) CBP assessed E.G. was part of a three member cell believed to be in the planning or operational phase of a White Supremacist Extremist (WSE) attack.  White Supremacist Extremists are groups characterized by various belief systems central to which are a belief that white people should have dominance over people of other races and religions, and believe that it is appropriate to use violence to advance their goals. E.G. was denied entry into the United States.

12.    **EXAMINATION OF E.G.'S ELECTRONIC EVIDENCE:** Text messages were discovered between E.G. and "Chris" (614-980-1305) on multiple days. During a September 6, 2019 communication, E.G. and Chris discussed taking out student loans to convert a bus into a motor home and travel the United States. Chris suggested taking out student loans to pay for the bus and later stated not to worry about the loans since they were "checking out at 30." It is your affiant's belief "checking out at 30" as used here was a reference to Chris's plan to commit an act of violence, which would most likely result in his and E.G.'s death. In related text chats between E.G. and Chris about fundraising for the purchase of a bus, they debated obtaining funds from E.G.'s mother and a potential plan to exploit the distribution of student

Nazi terrorist group Atomwaffen Division, Nordic Resistance Movement, Iron March, and European Domas.

4

loans in upwards of $100,000. During this communication, Chris exclaimed: "If we aren't going to be alive to pay it back, it's free money."

13.     In one meme obtained from E.G.'s phone, a bus was depicted with weapons pointing out of the back of a school bus and being portrayed as a "tail gunner."

14.     E.G.'s phone also contained several Discord handles including his main point of contact, Chris. A Discord chat room was also identified in his contact list titled: "Bus Squad."

15.     During another communication, Chris stated his biological mother was Swedish and he did not like his stepmother because she was Mexican. E.G. responded by saying the two of them should "go siege on her." Open source research found "Siege" was a book by American Neo-Nazi James Nolan Mason. Mason believed Nazis could not take power as long as the existing U.S. government remained in place. Mason advocated murder and violence to create chaos and anarchy and destabilize the system. Mason considered Timothy McVeigh and James Fields Jr. to be "heroes" and claimed the white race was in danger because of the Jews. Mason commented on the election of Donald Trump that "in order to Make America Great Again, you had to make it white again."

16.     E.G.'s document and media exploitation (DOMEX) revealed paraphernalia and symbolism consistent with Atomwaffen[2] and the more violent White Supremacist Extremist groups. "Siege" was referenced in text chats with Cook and pictures of the book were depicted.

---

[2] The Atomwaffen Division (*Atomwaffen* meaning "nuclear weapons" in German) is a neo-Nazi terrorist network. Formed in 2015 and based in the Southern United States, it has since expanded across the United States and it has also expanded into the United Kingdom, Canada, Germany, the Baltic states and other European countries. The group is part of the alt-right, but is considered extreme even within that movement. It is listed as a hate group by the Southern Poverty Law Center (SPLC). Members of the Atomwaffen Division have been held responsible for a number of murders, planned terrorist attacks, as well as other criminal actions.

Siege (a 500 page book) was required reading for Atomwaffen and the extreme elements of other WSE groups. Members must pass a test to prove their mastery of the book. The book advocated for cell-structured, decentralized, and guerilla warfare style tactics to achieve the intended mission of upending the "system."

17.     In one Whatsapp text chat with Chris, reference to a "baptism" was made, presumably indicating some form of initiation (pictures also depicted some form of initiation).

18.     E.G.'s October 15, 2019 communications with Chris, appeared to be along the lines of a recruitee/recruiter relationship where E.G. was suggesting his bona fides to Chris to be part of the group. E.G. stated that while he was Italian, they were fascists (with additional emphasis). Based on their chatter, it did not appear they had known each other for very long. This was supported by the CBP TTRT officers who believed the relationship was developing.

19.     Text chats between E.G. and Chris revealed collaboration on a WSE handout/brochure referencing Iron March[3] and ideology/symbolism consistent with the more violent WSE groups.

20.     **INTERVIEWS:** A search of Ohio records for "Chris Cook" using the age of 17 years old identified CHRISTOPHER BRENNER COOK (COOK) who resided in Dublin, Ohio. On November 1, 2019, COOK was interviewed at his residence. COOK's mother was also present during the interview. When asked if she was aware of the contact between COOK and E.G., COOK's mother responded that she became aware following a call she had received from

---

[3] In 2015, Atomwaffen announced its creation on the neo-Nazi website IronMarch.org, that had been linked to several acts of neo-Nazi terrorism and violent militant groups such as the Nordic Resistance Movement, National Action, and the Azov Battalion. In its initial posts, the group described itself as a "very fanatical, ideological band of comrades who do both activism and militant training. Hand to hand, arms training, and various other forms of training. As for activism, they spread awareness in the real world through unconventional means."

the Findlay Police (FBI - Cleveland). COOK's mother was not fully aware of the details surrounding E.G.'s planned visit.

21. COOK advised that E.G., who attempted to cross the border from Canada into the United States at the Detroit Ambassador Bridge while having firearms, ammunition and WSE material in his vehicle, was planning to visit him. When asked if COOK knew why investigators were at the residence, COOK replied that he knew why because COOK had received a call from E.G. about the incident at the border. E.G. warned COOK he would likely be contacted. COOK stated that he deleted all of the communications with E.G. after E.G. alerted COOK about the CBP stop. COOK indicated he only knew E.G. through online chats and had not met him in person. COOK stated they met through the gaming social media app Discord approximately two months ago (September 2019). COOK stated he believed E.G. was around 22 years old and was not married.

22. COOK stated he and E.G. had engaged in some white supremacist related discussions, but would not elaborate further. COOK did not know exactly where E.G. resided other than Canada; he had only seen one picture of E.G., which was taken while E.G. was hunting and holding a dead bird. COOK acknowledged texting E.G. and speaking on the phone to him on several occasions.

23. COOK stated he did not remember E.G.'s online information. Per the interviewing agents, COOK appeared to provide only limited responses, but gave the impression he knew more. COOK did say E.G. played the game Hearts of Iron IV online as well. Hearts of Iron IV was a grand strategy war game that focused on World War II. Players may take control of any nation in the world in either 1936 or 1939 and lead them to victory or defeat against other

7

countries. The game was played on Discord and assisted with the introduction of like-minded individuals like Neo-Nazis.

24.    COOK stated he knew E.G. was going to meet another friend in Tennessee first, but he didn't know a specific name. E.G. was then going to visit COOK for a couple of days before going back to Canada.

25.    COOK stated he and E.G. were going to go hiking and camping in wooded areas and fields nearby his residence. When asked about the weapons E.G. had with him, COOK stated he was aware E.G. had three rifles including an AR-15 rifle and an older Italian rifle. COOK couldn't recall specifics of the third weapon. COOK stated they were going to go shooting while hiking and camping. COOK's mother was not aware of those plans.

26.    COOK's mother further stated there were no weapons in her household and she was not aware of any weapons at COOK's father's residence either. COOK stated he shot a rifle while participating in the Boy Scouts of America. COOK did not recall ever shooting a gun any other time.

27.    COOK described E.G. as possibly "autistic" due to the fact E.G. was so detailed by nature and also very focused on rules. COOK stated when they spoke over the phone, the conversations were just the two of them "kidding around" with no specific topics. COOK stated they did discuss COOK's hope of buying an old school bus and converting it to live in, similar to a camper. COOK stated he wanted to "live off the grid" at some point and the two discussed hanging out together on the bus. When asked about any recent contact with E.G., COOK stated he spoke to E.G. the day of the border incident and a couple of times since.

28.    COOK was not aware of any criminal activity committed by E.G. nor was COOK aware of any attack planning.

8

29. COOK stated E.G. was not a member of Atomwaffen. COOK explained Atomwaffen was a revolutionary organization he had been aware of for a few years. COOK stated Atomwaffen was mis-managed by stating they operated in "ill." COOK felt Atomwaffen could do a better job of promoting their cause. COOK did not elaborate on Atomwaffen's mission.

30. COOK had read the book "Siege" by James Mason and stated the "blueprint did not resonate" with him. Despite this statement, investigators know that COOK recommended his followers read Siege and other related books.

31. COOK had read several other books to include topics of Karl Marx, George Lincoln Rockwell (founder of the American Nazi Party) and Owsley Stanley (LSD manufacturer). COOK considered himself to hold "traditional" views in politics. Considering his young age, COOK appeared to have a lot of knowledge on white supremacy and philosophy in general. COOK stated he did not have any group affiliations.

32. COOK's phone number was verified by Agents as 614-980-1305. COOK would not provide usernames for his online activity. COOK did provide his email address of chris.b.cook@icloud.com.

33. On November 4, 2019, COOK's mother was interviewed for the purpose of showing her screen shots of text messages between COOK and E.G. The screenshots were captured by CBP from E.G.'s phone during his interview in October of 2019.

34. One screen shot of the text communication included a photo of a shopping cart and "the Aryan shopper" written underneath the photo by COOK. A second screen shot of the text communication showed a room with three individual Nazi flags hanging on a wall. The photo was taken by COOK and sent to E.G.

35.     COOK's mother stated the photo with the flags was from COOK's bedroom. The flags were only up for one day. She returned home from work, saw the flags and made COOK take them down. COOK attempted to rationalize having the flags on the wall, but she told COOK to take them down and they were removed.

*"Lights Out" and Other Plans*

36.     **CONFIDENTIAL HUMAN SOURCE (CHS1):** CHS1 is a self-identified de-radicalized Nazi and friend of COOK. CHS1 was part of a large group text chat with COOK and others wherein COOK disclosed that he was being investigated by the FBI but believed he was getting away with it. CHS1 reported that COOK has talked numerous times about creating Nazi militant cells across the nation in the likes of Atomwaffen Division, and in the past attempted to do so. CHS1 and COOK met on Discord; they did a lot of "shitposting," but gradually grew more radical. CHS1 eventually decided the Nazi life was not for him, but COOK grew more radical.

37.     CHS1 stated around October 2019, COOK introduced an idea to an approximate 18 member text group to save up money in hopes to buy a ranch and a bus so they could live off the land and perform militant training. CHS1 believed COOK and others had a large amount of money saved. COOK wanted the group to be "operational" by the 2024 election because he believed it was likely a Democrat would be elected at that time. The timeline for being operational would accelerate if President Trump lost the 2020 election. CHS1 indicated COOK definitely wanted to be operationally ready for violence, but also activism.

38.     CHS1 stated as recent as Fall 2019, COOK used the "Mega" file storage app for documents and videos.   Mega was an app that provided user-controlled encrypted cloud *storage* and chat through standard web browsers.   COOK sent out links to videos or

10

documents in his document called "insurgency" showing how to make car bombs, weapons from items found at the hardware store, Molotov cocktails, and also how to make bath salts. CHS1 thought COOK was getting his information from the Dark Web.

39.    CHS1 provided FBI agents with screen shots of the group conversation and COOK's comments on his contact with FBI. CHS1 also provided screen shots of Mega files, to include a link to building a car bomb and thermite firebomb.

40.    CHS1 showed FBI agents a Mega File page which indicated a group name of "The 10th Crusade: Thot-> Sieg Hell."[4] CHS1 also provided his/her phone to investigators, which displayed additional group texts and texts between CHS1 and COOK.

41.    A review of the Mega File by Agents revealed information regarding military operations and training from publicly available military and field training manuals. Also contained in the Mega File were instructions on the construction, production, and manufacturing of improvised explosive devices (IEDs). The instructions provided specific details of viable IED construction.

42.    Of note in the text thread between CHS1 and COOK was a photograph COOK sent CHS1 on September 1, 2019. In the photograph, COOK was wearing a flecktarn digital camouflage jacket and a skull face bandana while holding the book, Siege. Flecktarn camouflage is a German camouflage pattern widely adopted by members of Atomwaffen. Also,

---

[4] The group name references the book Siege and the 10th Crusade. Siege is a book often cited by white supremacists and Neo-Nazis which places an emphasis on gaining power through armed struggle rather than political means. This so-called Siege is synonymous with the idea behind forming a "10[th] Crusade." The official 9 Crusades were a series of military campaigns organized by Christian powers in order to retake Jerusalem and the Holy Land back from Muslim control. Imagery of a pending "10[th] crusade" has been used as a symbol in Discord channels to represent the Alt-right, white supremacist community.

11

there was a message from COOK to CHS1 in October of 2019 which read, "LFMAO one of my hus Niggas is cell leader for AWD." AWD was likely a reference to Atomwaffen Division.

43. During a texting exchange on November 19, 2019 between CHS1 and COOK, COOK indicated that he wanted CHS1 to read the ten listed books to stay focused on the white supremacist ideology. The list of books included Squires Trial, Awakening of a NS, Faith and Action, Path of the Gods, Next Leap, Zero Tolerance, DVX, Mental Liberation, Open Letter to the White Man, and Siege.

44. On November 24, 2019, CHS1 stated that COOK was travelling to Denver, Colorado, to visit family for the Thanksgiving holiday and mentioned he was going to try to meet with the author of the book "Siege" - James Mason.

45. CHS1 stated COOK was no longer using the messenger Wire with user name @Shockro and had switched to Riot messenger with the username Toho25.

46. On November 27, 2019, CHS1 reported that COOK shared plans via text with a group of 8-10 individuals to participate in a large scale power outage by attacking the U.S. Electric Grid. COOK called the plan "Lights Out." This group text included SAWALL with phone number **321-960-1899** and FROST, known only at the time as KAXUL.

47. COOK sent CHS1 a link to a U.S. Department of Energy report titled, "Large Power Transformers and the U.S. Electric Grid." The link was also provided in the group text. This report was available on the internet via open source. It discussed specific information about the grid and also issues with replacing large transformers in a timely manner. COOK directed CHS1 and others to read the first eight pages of this report to better understand the plan.

48. Per CHS1, the plan was to knock out key power grids by strategically shooting rifle rounds into power sub-stations costing the government millions in recovery spending.

12

CHS1 forwarded additional information received from a friend of COOK, known only to the CHS as KAXUL, which provided more specific details of the power outage. The plan called for a disruption of electric power at several power stations in the southeast portion of the country. KAXUL sent CHS1 a text saying "Leaving the power off would wake people up to the harsh reality of life by wreaking havoc across the nation." CHS1 provided several screen shots of the texts to investigators.

49.     Links were provided for possible target locations to include Jacksonville: Duval and Putnam plants; Miami: Corbett and Orange River substations; and Others: Midway substation.

50.     CHS1 stated the plan to execute a power outage was scheduled for the summer of 2021 and later discussion included a power plant in California.

51.     On February 8, 2020, CHS1 reported that SAWALL and another individual are in charge of recruitment for the group. They were using a larger group named "The Front" into which they would try to recruit like-minded individuals who would be vetted for possible recruitment into the "Lights Out" group. Originally, "The Front" would be a Discord channel; however, the group recently went away from Discord.

52.     On February 22, 2020, CHS1 reported that the Riot messaging discussion group identified as "The Front" includes SAWALL, COOK, FROST, and another individual. During planning discussions, SAWALL asked, "Can I get an idea of those who want to continue direct action afterwards too?" He went one to say, "I know I and Toho have plans afterwards." I know Toho to be the username for COOK. SAWALL also said "I plan on going until I die and dying in what is effectively my homeland for this revolution. Martyrdom is the path to Valhalla." He also stated, "Running just isn't an option for me" and "I can say with absolute certainty that I will die

13

for this effort. I swear it on my life." COOK said, "I can say the same." CHS1 also reported that the group discussed plans to obtain weapons. SAWALL said, "you'll need money and patience because we can only acquire so many at a time." FROST said, "Very correct, takes time to build guns." SAWALL responded, "Honestly I'd love it I could get to the point where we could have your sole focus building them and developing stuff." SAWALL also said, "I could honestly support your needs if necessary with my job." FROST explained the process to mill an AR lower only takes 3 to 5 hours but he could not currently do it because he was not home. Milling a gun involves obtaining a gun that is only approximately 80% complete (and thus does not have a serial number), then finishing the manufacturing of the gun (e.g. by drilling holes for the receiver) in order to obtain possession of a functional gun without a serial number. FROST is known to law enforcement to be residing in Indiana for school but is from Texas. SAWALL suggested that FROST could consider moving in with COOK and SAWALL and they could get a larger place to live.

53. **FBI ONLINE COVERT EMPLOYEE:** On February 12, 2020, an FBI online covert employee (OCE1) joined a group chat in an online messaging application. One of the members was "judenjager14" which CHS1 identified as SAWALL. SAWALL asked OCE1 what he/she knew about the Front, the group OCE1 would be effectively joining. OCE1 indicated he/she did not know much about it. SAWALL explained they are "a group incredibly interested in direct action against the system. We have plans, research, arms, and meetups for training and to fulfill our missions and work towards very similar goals that you've seen in the Turner Diaries. The plans have been in motion for months, but we are a relatively new group because we only recently went public. If you truly want a fascist society I will put in the effort to work with you but recruitment is long and not going to be easy. It's a month long process beginning

14

with 'radicalization' i.e. education and creating in you a revolutionary mindset and ending with you have to prove you're not just a talker and doing an act against the system IRL. If any of this seems too tough or not you're style, I recommend leaving now, we are extremely serious about our goals and ambitions." I know from my training and experience that IRL means "in real life." SAWALL proceeded to recommend readings to OCE1 and answer questions about the readings as part of the radicalization process. On February 14, 2020, SAWALL informed OCE1 that the group has a uniform requirement, "Typically most of us go for flecktarn, combat boots, a bakaclava [sic] (usually a skull mask one) and gloves." SAWALL further stated, "If you're truly committed like you seem you are you could begin investing in this, it's a motivating thing to have a uniform, symbolic really of how committed you are to real action."

54.    **COOK, SAWALL AND FROST a/k/a KAXUL MEET:** On January 25, 2020, COOK's mother told FBI agents that COOK planned to relocate to Wisconsin and specifically Oshkosh to live with an individual named JACKSON SAWALL. COOK's mother provided a telephone number of **321-960-1899** for SAWALL, whom she said COOK met on an unknown gaming website. She further understood from COOK that SAWALL worked at a plastics company in Wisconsin and promised to get COOK a job at the same location.

55.    On January 27, 2020, CHS1 stated Riot.me moniker "KAXUL" planned to deliver four milled AR47 rifles to COOK in three weeks. CHS1 later clarified "KAXUL" was going to deliver one AR47 rifle to COOK.

56.    During a follow-up telephone conversation with COOK's mother on February 3, 2020, she mentioned that COOK planned to move to Wisconsin on or about February 20-21, 2020. COOK's mother further explained that, according to COOK, SAWALL was going to drive to Ohio to pick up COOK.

15

57.     As anticipated per COOK's information to his mother, on February 20, 2020 SAWALL arrived at approximately 11:32 p.m. and picked up COOK in his truck. Over the next several hours, surveillance of SAWALL and COOK took law enforcement far and wide, including multiple stops at Wal-Mart Supercenters across the Columbus metro area and a Holiday Inn Express Columbus – Dublin.

58.     Specifically, on February 21, 2020 at approximately 1:37 a.m. SAWALL and COOK attempted to visit the Wal-Mart located at 1221 Georgesville Road, Columbus, OH. This location was closed. Following this failed attempt, SAWALL and COOK drove to the Wal-Mart located at 1693 Stringtown Road, Grove City, OH, which was open 24 hours a day. Surveillance observed the two individuals trying on hats in the store. SAWALL and COOK returned to their truck at 2:14 a.m. and departed for the Holiday Inn Express.

59.     At approximately 5:04 a.m. SAWALL and COOK returned to the truck and proceeded to the Wal-Mart located at 5900 Britton Parkway, Dublin, OH. Prior to entering the store, COOK removed his gray sweatshirt and put on a camouflage jacket similar to the one SAWALL was wearing. While in the store, SAWALL made a small purchase and later put the unknown item in the backseat of his truck. At approximately 6:40 am, the two individuals entered another Wal-Mart located at 2700 Bethel Road, Columbus, OH. COOK appeared to purchase a Sandisk USB flash drive at this location.

60.     At approximately 7:30 am, SAWALL and COOK met with an unknown male believed to be "KAXUL" in Reibel Woods Park, 6000 Hayden Run Road, Hilliard, OH. The unknown male was driving an older model dark blue Mercedes passenger vehicle bearing Texas license plate HYY 5824. A check of the HYY 5824 tag revealed that it was associated with a 2017 Nissan, and thus, the plate had most likely been switched out.

16

61. SAWALL, COOK and the unknown male believed to be "KAXUL" proceeded to drive both vehicles to a Bob Evans restaurant and then, after eating breakfast, drove both vehicles to the Holiday Inn Express. Both vehicles were parked in the southwest corner of the parking lot furthest away from the hotel entrance. The three individuals moved several bags and boxes from the Mercedes into SAWALL's pickup. Surveillance video recorded this movement of bags and boxes. Investigators were able to view the video and observed an upper receiver from an AR platform weapon taken out of the Mercedes, placed into a bag, and loaded into SAWALL's pickup.

62. A short time later, all three individuals got into SAWALL's pickup and left the hotel parking lot. COOK, SAWALL, and the unknown male believed to be "KAXUL" travelled to Centerville, OH, where they drove around rural areas. They went to Chick-Fil-A for lunch before driving to Cabela's, located at 5500 Cornerstone N Blvd, Centerville, OH 45440. While inside Cabela's, surveillance footage showed them looking at scopes, binoculars, and ammunition. It appeared COOK secreted a box of ammunition in his jacket before all three exited Cabela's.

63. Next, SAWALL drove the three to Home Depot, located at 5860 Wilmington Pike Rd, Centerville, OH 45459, where SAWALL purchased several items to include a chainsaw, gloves, a framing hammer, and duct tape.

64. After the three individuals left the hotel parking lot together in SAWALL's truck, investigators collected the Vehicle Identification Number (VIN) from the Mercedes and observed a student parking permit for Granite Student Living on the vehicle. Investigators later learned that the VIN of the Mercedes returned to a 1984 Mercedes Benz 300 Series, registered under Frederick Allen Frost, born 1959, in Katy, TX. Also listed as a licensed driver was

17

JONATHAN ALLEN FROST, born 1997. A driver's license photograph was provided to law enforcement who positively identified the unknown male with COOK and SAWALL as FROST. As noted before, FROST a/k/a KAXUL had represented that he was originally from Texas.

65.     While the vehicle was parked at Home Depot, agents observed in plain view from outside of the vehicle, an Amazon shipping box inside the pickup truck. The Amazon box was addressed to JONATHAN FROST, 225 Northwestern Ave. Rm "303", West Lafayette, IN 47906. The "303" was smudged. Agents determined the shipping address matched the address for Granite Student Living at Purdue University.

66.     COOK, SAWALL, and FROST departed Home Depot and proceeded toward Columbus, OH. Near mile marker 74, Ohio State Patrol (OSP) initiated a traffic stop. All three individuals were interviewed separately and informed the officer that they were "woodsmen planning a camping excursion." OSP troopers observed ammunition in the pickup and a canvas bag that was consistent with the type commonly used to store rifles. Based on their observations, OSP troopers conducted a protective sweep of the lunge areas inside the vehicle prior to allowing the passengers back inside the vehicle. Troopers located an upper and lower receiver for an AR platform rifle with no serial number, two magazines, and several boxes of 7.62 ammunition inside a bag. Troopers also located a Nazi style flag, but no camping equipment.

67.     COOK, SAWALL, and FROST were released from the traffic stop and proceeded back to Columbus, OH. COOK and SAWALL left the hotel in the pickup at 6:50 p.m. and drove to COOK's house. They went inside and spent about an hour. They left the residence and drove straight to the hotel. It appeared that neither individual carried anything nor did they load anything in the truck. Both entered the hotel at about 8:18 p.m. and came back out at 8:24 p.m. They sat in the car for 10 minutes and departed in the pickup. They drove to a gas station then

18

drove side roads to Olentangy Road and Kinnear Road. Surveillance lost them at about 9:20 pm, when they went through a yellow traffic light and the agent following could not go through as there was a police cruiser in the lane next to him. They were last seen northbound on Olentangy heading toward Ohio State University.

68.     Surveillance picked COOK and SAWALL up again at the residence at 10:40 p.m., where they stayed for a couple of minutes. They went to Get Go gas station for a couple of minutes then drove to a Gentleman's Club at 3609 Trabue. At 1:30 am, now February 22, 2020, surveillance observed SAWALL depart the club. Surveillance did not observe COOK leave with him. SAWALL returned to the hotel at 1:50 a.m. At 2:09 a.m., the dark blue Mercedes bearing Texas tag HYY5824, was observed in the front parking lot of the hotel.

69.     COOK's whereabouts remained unknown until COOK and FROST were spotted by surveillance returning to the Holiday Inn Express wearing extremely muddy boots around 5:11 p.m. Surveillance had previously observed FROST switch his illegal Texas license plate to his legal Texas plate, i.e. the one which was associated with the VIN, prior to his departure. COOK and FROST's whereabouts were unaccounted for during the afternoon hours along with their reason for returning with such muddy boots.

70.     On February 23, 2020 at approximately 5:50 a.m., FROST departed Columbus towards Indianapolis. Surveillance followed him for a large portion of the trip as he headed west on I-70 towards Indiana.

71.     On February 23, 2020, at 7:02 p.m., SAWALL returned to Wisconsin via Interstate 94 West. SAWALL was pulled over by the Wisconsin State Patrol near Mile Marker 102 on I-41 at approximately 8:45 p.m. for having a license plate that was affixed in a manner that was not rigid. A K9 unit in the vicinity assisted with the stop. The K9 unit returned a

19

positive hit on narcotics in the vehicle which prompted a probable cause search of the vehicle. The search revealed no guns or ammunition. SAWALL stated that he had visited his best friend Chris in Ohio, whom he had visited in Columbus once before. While in Ohio, he and Chris picked up someone who had previously used cocaine, but not when they were with him. SAWALL knew that individual as "Theo" but did not know his last name. SAWALL stated he did not own a rifle yet but he would be interested in owning AR-15s, AK-47s, and SKSs. SAWALL advised he likes AR-15s because they are cheap and you can build them yourself. During a search of SAWALL's vehicle, a number of items were observed, including but not limited to: a GoPro video camera, an American flag, a Nazi flag, and a shooting vest with loops for shotguns shells. Additionally, in the mesh side pocket of a backpack there was a crumpled piece of paper with a list with some items crossed off and some with checkmarks: Mosque (checked), Strip Club (crossed off), School (crossed off), Truck (checked), Synagogue (crossed off), Fast Food Restaurant (crossed off), Tower (checked). The paper was torn so only part of the additional items could be viewed, including but not limited to: "pray paint" (checked), "bber gloves", "3 new prop posters." Based on my training and experience, I believe these items to be: spray paint, rubber gloves, and 3 new propaganda posters. During the traffic stop, SAWALL's cellular telephone was observed to have notifications on the screen, including a text message from "Nana, 42 iMessages from "Chris Islamo-Cumshack," a phone notification, and an iMessage from "Scruffy." SAWALL provided his phone number as **321-960-1899**. The traffic stop ended at 10:20 p.m. and SAWALL arrived at his grandparents' house at 10:45 p.m.

72. **COOK TRAVELS TO TENNESSEE:** On February 24, 2020, CHS1 provided information that COOK mentioned he was kicked out of his residence following an argument with his mother and planned to move to Tennessee. On the evening of February 28, 2020,

investigators observed COOK's cellular telephone showed repeated pings in the area of Greyhound, 111 E. Town St., Columbus, OH 43215. The pings continued in the same area into the overnight hours until approximately 8:00 a.m. at which point COOK's cellular telephone pings indicated the phone was in Springfield, OH.

73. Investigators proceeded to Greyhound and discovered COOK purchased a bus ticket from Columbus, OH, to Clarksville, TN, with bus transfers in Dayton, OH, and Nashville, TN. Investigators in Dayton, OH, confirmed COOK had arrived in Dayton, OH, and subsequently boarded Bus 1101 which departed at 11:40 am in route to Nashville, TN. Agents in Nashville, TN, confirmed COOK arrived via Bus 1101 at approximately 6:50 p.m.. COOK remained in Nashville, TN, until approximately 1:25 a.m. on March 1, 2020, at which time COOK departed on Bus 1162 in route to Clarksville, TN. Agents in Clarksville, TN, observed COOK's arrival at the Greyhound Bus station, 2249 Lowes Dr, Clarksville, YN 37040. Investigators in Columbus, OH, were able to observe COOK's cellular telephone pings during the entire trip.

74. Upon arrival, COOK met with an unknown male and both walked a short distance to the parking lot of Lowe's Home Improvement, 2150 Lowe's Drive, Clarksville, TN 37040. COOK and the unknown male entered a display storage shed in the parking lot of Lowe's. Officers with Clarksville Police Department located COOK and the unknown male, who was subsequently identified as J.B., a 14-year-old missing juvenile from Dacula, GA. COOK was arrested for Trespassing and J.B. was released into the custody of the Department of Child Services. Investigators in Columbus, OH, observed COOK's cellular telephone pings during the police investigation.

21

75. Clarksville Police Officers located an AR platform rifle in COOK's possession with no serial number along with two magazines. COOK mentioned to Police Officers the rifle belonged to him. J.B. had ammunition in his possession. Also in COOK's possession were a silver Apple MacBook Pro Serial C02NX4UTG3QJ, a Memorex 64 GB USB flash drive, a silver iPhone S/N 328020KEWH8 IMEI 011434009523828, a black Iphone, and a silver Ipad with a Hilliard City Schools property sticker. COOK also had a black and white flag with a Nazi insignia printed on it. It should be noted it appears to be the same flag located during the traffic stop conducted by Ohio State Patrol (OSP) on February 21, 2020. Investigators also believe the rifle is the same rifle provided to COOK by FROST a/k/a KAXUL and located by OSP during the traffic stop to include the magazines.

76. **THE GROUP'S COMMUNICATIONS:** The investigation to date has revealed that SAWALL communicates on a number of messaging applications including Riot and Discord. As described above, these communications include recruitment for "Lights Out." Based on my training and experience, as well as information provided to me by other law enforcement officers, I know that individuals can use their cell phones to utilize these messaging applications. In addition, toll records on COOK's phone show COOK and SAWALL had 413 phone contacts between December 21, 2018 and 7 November 7, 2019. A pen register on COOK's phone shows COOK and SAWALL continue to communicate via phone; between February 21 and March 4, 2020, SAWALL and COOK exchanged 12 phone calls. According to CHS1, on approximately March 2, 2020, FROST a/k/a KAXUL stated COOK and SAWALL believe the feds are following them and will be offline for approximately two weeks.

22

## TECHNICAL INFORMATION

77.    In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

78.    Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon Wireless

23

typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## Cell-Site Data

79.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

80.     Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## E-911 Phase II / GPS Location Data

81.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information

24

about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

82.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

25

## Subscriber Information

83.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

84.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

85.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

86.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may

26

be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

87.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

88.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

27

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device 321-960-1899 (referred to herein and in Attachment B as "the Target Cell Phone"), that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, in Bedminster, NJ 07921.

2. The Target Cell Phone.

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

- a. The following information about the customers or subscribers associated with the

    Target Cell Phone for the time period **October 23, 2019 through the present:**

    - i.   Names (including subscriber names, user names, and screen names);

    - ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    - iii. Local and long distance telephone connection records;

    - iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    - v.   Length of service (including start date) and types of service utilized;

    - vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    - vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 45 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

3

c. Information about the location of the Target Cell Phone for a period of up to 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

v. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

vi. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of violations of 18 U.S.C. §§ 371 (Conspiracy), 373 (Solicitation to Commit a Crime of Violence), 842(p) (Distribution of Information Relating to Explosives, Destructive Devices, and Weapons of Mass Destruction), 1366 (Destruction of an Energy Facility), and 2339A (Providing Material Support to Terrorists) involving CHRISTOPHER BRENNER COOK, JACKSON SAWALL (SAWALL), JONATHAN ALLEN FROST a/k/a KAXUL (FROST a/k/a KAXUL) and other unidentified subjects during the period October 23, 2019, through the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the

4

government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.